[Cite as *State v. Kelly*, 2022-Ohio-1696.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Toledo                     Court of Appeals Nos.  L-21-1069
                                                                       L-21-1070
          Appellee                                                     L-21-1071

                                                 Trial Court No. CRB-20-09133

v.

Anthony C. Kelly                                 **DECISION AND JUDGMENT**

          Appellant                              Decided:  May 20, 2022

* * * * *

David L. Toska, City of Toledo Chief Prosecuting Attorney, and
Christopher D. Lawrence, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, defendant-appellant, Antony Kelly, appeals the

April 1, 2021 judgment of the Toledo Municipal Court, convicting him of obstructing

official business, resisting arrest, and aggravated menacing.  For the following reasons,

we affirm the trial court's judgment, in part, and reverse, in part.

# I. Background

{¶ 2} On October 25, 2020, criminal complaints were filed in the Toledo Municipal Court, charging appellant with obstructing official business, a violation of R.C. 2921.31(A), a misdemeanor of the second degree, resisting arrest, a violation of R.C. 2921.33(A), a misdemeanor of the second degree, and aggravated menacing, a violation of R.C. 2903.21(A), a misdemeanor of the first degree. In a separate case, Kelly was also charged with driving under suspension, a violation of R.C. 4510.11(A), a first-degree misdemeanor, and the following minor misdemeanors: failure to wear a safety belt, a violation of R.C. 4513.263(B)(1); window tint restrictions, a violation of R.C. 4513.241; and failure to register vehicle, a violation of R.C. 4503.11. The matters were consolidated and tried together to the bench, where the following evidence was produced.

{¶ 3} Toledo Police Patrolman Nicole Tucker testified that on October 25, 2020, she observed appellant driving with an expired registration sticker on his vehicle. Tucker began to follow the vehicle, and initiated a traffic stop as appellant was parking his car in the parking lot of the Oak Hills Apartment complex.

{¶ 4} Tucker testified that she approached the vehicle and asked appellant to present his driver's license and insurance, and he refused. Tucker asked several more times for his license and insurance information, and appellant responded that he was not going to give it to her because he was home, and there was nothing that she could do. Tucker testified that appellant's act of refusing to produce his driver's license or

2.

insurance information impeded her lawful duties to conduct an investigation at that traffic stop. Tucker did note, however, that once she ran the vehicle registration, she was able to determine that appellant had a suspended driver's license.

{¶ 5} Tucker then ordered appellant to step out of the vehicle, and appellant replied that he was not going to get out of the vehicle. Tucker informed appellant that if he did not exit the vehicle, then he was going to go to jail. Appellant continued to refuse to get out of the vehicle, so Tucker used force to remove him.

{¶ 6} Tucker stated that appellant did not comply with her efforts to get him out of the vehicle, and that he tried to pull himself back into the vehicle. Appellant wrapped his hand around the door of the car and attempted to pull away from Tucker. Tucker testified that she was able to pry appellant's fingers off of the door frame, and then her partner, Officer James Schroeder, assisted in placing appellant's hands behind his back so that he could be handcuffed. Tucker testified that appellant was actively pulling away and resisting while she was placing the handcuffs on him.

{¶ 7} Tucker's bodycam video was entered into evidence and played for the court. The video shows Tucker approaching the passenger's side of appellant's vehicle and asking him how he is doing. Appellant responds that he is "bored." Tucker then asks for his license and insurance, and appellant replies "I'm at home." Tucker asks again, and appellant looks down at the middle console and replies, "something right here." Tucker then walks around to the driver's side of the vehicle, and while walking, she comments that "this isn't going to go well."

3.

{¶ 8} Once at appellant's driver's side window, she says "Give me your driver's license and insurance please." Appellant begins looking in his console again, and can be heard saying something that sounds like "it's in a card, ma'am." Tucker tells appellant to keep his hands where she can see them, so he stops looking through the console and puts his hands up by the wheel. Tucker then asks, "Do you even have a license, and don't lie to me because I already know the answer to this." Appellant responds, "You know everything about me." Tucker then opens the driver's side door, and instructs appellant to come out of the vehicle.

{¶ 9} Appellant remains seated in the vehicle for about seven seconds while Tucker tells him four times to come out. When Tucker tells appellant to come out of the car and put his hands on top of the car, appellant raises both hands as if to surrender while still seated in the driver's seat. Tucker again tells appellant to come out of the car, her voice becoming more assertive in tone. Appellant looks at Tucker and asks "Who told you all this?" Tucker then warns appellant, "Don't make me pull you out of this car," to which appellant responds, "Lady if you was to kill me I wouldn't get a (unintelligible)." Tucker replies "Did I say that?" and then forcefully yells at appellant to get out of the car. Appellant says "I'm getting out the car," but is not making any movements to do so. Appellant then asks Tucker if her camera is on, and she replies "Yes."

{¶ 10} Appellant only begins to slowly move his legs as Tucker begins pulling on his left arm. Appellant then exclaims, "You ain't gotta grab me like this," and Tucker

4.

replies, "Apparently, I do." Appellant repeats that "You ain't gotta grab me cause you know I was gonna get out." While appellant was saying that, he can be seen getting out of the car. As he gets out of the car, appellant grabs the top of the car door with both hands. The camera shows Tucker putting appellant's left hand behind his back. As this is happening, appellant's right hand can be seen loosening its grip on the car door, but then the view of appellant's right hand becomes obscured. About four seconds later, Tucker demands that appellant put his right hand behind his back, because he had not yet done so. Tucker then handcuffs appellant and walks him over to her police cruiser, informing him that he is being arrested for "obstructing" and "resisting."

{¶ 11} We note that Tucker ordered appellant out of the car after approximately 22 seconds of questioning regarding his license and insurance, and the entire encounter from when Tucker first approached appellant to when she secured the handcuffs on him took approximately 80 seconds. Appellant remained calm and composed the whole time. He did not yell or raise his voice. He did not utter profanities. He did not make any verbal threats. He did not make any menacing gestures or sudden movements with any part of his body. Although appellant's verbal answers were not directly responsive to Tucker's questions regarding his license and insurance, and although appellant moved slowly when ordered out of the vehicle, it is clear from the video that appellant did not exhibit any belligerent, argumentative, or obstreperous behavior at any time during the stop.

{¶ 12} Schroeder also testified about the incident. Schroeder testified that he observed appellant driving on Hill Avenue with an expired registration sticker. Once the

5.

stop had been initiated, Schroeder heard Tucker ask appellant several times for his driver's license and insurance information, but appellant failed to provide it. Schroeder claimed that appellant's actions of refusing to produce his license and insurance, and staying in the car, impeded Schroeder's lawful duty to conduct an investigation into the stop.

{¶ 13} Schroeder testified that Tucker opened the driver's side door and escorted appellant out of the car by grabbing his left arm and applying pressure to a point on the back of his right shoulder. Schroeder described that when they got appellant's left hand behind his back, appellant clutched the door frame of the car with his right hand, and would not give his right hand to the officers. Schroeder detailed that appellant "had a full grip on the -- it was not resting, it was more of a grip onto the door." Schroeder testified that Tucker "pried his fingers off of the door where he had gripped it. And each time he kind of made a movement like he was trying to, you know, pull away." Schroeder further testified that appellant "pulled away a couple times," but because of where appellant was positioned between the car door and the body of the car he really could not go anywhere. According to Schroeder, although appellant did not engage in any wild movements, he nonetheless actively resisted his arrest.

{¶ 14} Schroeder's body camera video was also entered into evidence and played for the court. In the video, Tucker can be seen grabbing appellant's left arm with her left arm, and placing her right arm inside the vehicle, presumably on appellant's back. Although appellant initially grabs the top of the car door with both hands, he quickly

6.

allows his left hand to be placed behind his back. Officer Schroeder can be seen holding appellant's left arm, but the video is obscured and does not show any of Tucker's struggle with appellant's right arm.

{¶ 15} Appellant, in his own defense, testified that he was not driving that day, and was simply listening to music in his car. Appellant described that when Tucker approached him she was aggressive and in a hurry to "beat [him] down," but he was calm. Appellant testified, in effect, that he was complying with Tucker, but that he was moving slowly and she wanted to rush him.

{¶ 16} Once appellant was arrested and in the back of the police cruiser, appellant began making threatening comments, and continued doing so after they arrived at the jail. According to Tucker, appellant told the officers that "he should have just killed us when he had the chance and that he should have fought us much more than he did." Appellant also threatened to cut the heads off of white people, and threatened to shoot Tucker with an AK-47. Tucker testified that while some of appellant's threats were general comments, others were personal to her, and caused her to fear for her own safety.

{¶ 17} Video from Tucker's body camera was again entered into evidence and played for the court. The video showed the officers and appellant arriving at the jail. Appellant refused to exit the cruiser, and insisted that Tucker grab him out, just like she grabbed him out of his car. As appellant was being escorted into the jail, he began a long, expletive-filled tirade, in which he repeated over and over that he "hate[s] white people." Appellant also threatened, "I wish I could cut 'em by the motherf***in neck,"

7.

and "You can do completely nothin' until you stab 'em, right where the f*** they work at, nig***. * * * And if you could vote for Trump, nig***, kill that nig***. F*** white people, nig***."

{¶ 18} Schroeder likewise testified that as they were driving appellant to the jail, appellant was making statements about how he should have fought them more, and that he should have killed them when he had the chance. Once they arrived at the jail, Schroeder testified that appellant told Tucker that he had an AK-47 with her name on it and that she should get a TPO against him.

{¶ 19} Schroeder's body camera video was also entered into evidence, and recorded much of the same threats made by appellant as Tucker's video.

{¶ 20} Upon the conclusion of the trial, the trial court found appellant not guilty of the traffic charges against him—i.e., tinted glass violation, expired registration, seatbelt violation, and driving under suspension. The trial court specifically noted that the state failed to meet its burden to prove these violations beyond a reasonable doubt. The trial court explained that the state did not produce any evidence beyond the testimony of the officers to prove that appellant was operating a motor vehicle with excessively tinted glass or expired plates, and it found that the officer testimony, alone, did not satisfy the state's high burden of proof. Similarly, the trial court noted that although the officers testified that appellant did not have his seat belt on, the state did not produce any evidence beyond that "conclusory statement" to demonstrate "what led [the officers] to that conclusion." Finally, on the charge of driving under suspension, the trial court found

8.

that the state did produce a LEADS report, but that the report was not certified, and there was no testimony as to the type of driver's license suspension, the length, the date that it started, or the date that it ended.

{¶ 21} The trial court then addressed the criminal charges against appellant, and found him guilty on all counts. Specifically, the trial court found appellant guilty of the offense of obstructing official business, reasoning:

[T]aking the totality of the circumstances that occurred within that time, the defendant's not answering her question in a reasonable way when she asked for his license; he said I'm bored. Asked again for his license; he said I'm at home. He refused to exit the vehicle in the parking lot. His body language, according to the officer, was tensing up, you know, hunkering down. The footage from her camera shows clearly that she's grabbing the suspect's left arm. She testified that there was a pressure point that is off the camera. You know, the body cameras aren't perfect, you only see a very limited view. We can't see what's outside of the view of that camera. But her testimony indicated that she had a pressure point on him and was pulling him out of the car, that he was not exiting the car upon her reasonable command. And then he grabbed the door, and her testimony revealed that he had -- she had to pry his hand off of the doorframe.

And, again, looking at his conduct and the totality of the circumstances, the Court is aware he was already under arrest for

9.

obstructing when he got down to the sally port at the jail, but certainly that obstructive conduct continued in the sally port, refusing to exit there and, again, having them having to delay and having to take extra steps to simply get him out of the car.

{¶ 22} In finding appellant guilty on the offense of resisting arrest, the court commented:

As to the resisting, some of the conduct overlaps; pulling away from the officer, refusing to put his hand behind his back and as a consequence Officer Schroeder that he had to assist her in getting both hands behind his back. Officer Schroeder indicated he had to grab his left wrist while Officer Tucker was prying his fingers off of the doors. And, again, this conduct is somewhat fluid in going from the obstructing into the point where they're asking you to put your hands behind your back because you're now under arrest. The act of grabbing the door to get out of the car, I could see that, but when she's literally prying your fingers off. You weren't letting go, you were resisting, you were pulling away. It was quick. It's not the worst resisting I've seen. It's certainly not the worst resisting they've experienced, but it was there."

{¶ 23} Finally, on the offense of aggravated menacing, the court found appellant guilty based upon his specific threat to Tucker that he had an AK-47 with her name on it and that she needed to get a TPO.

10.

**{¶ 24}** Following the trial, the court proceeded immediately to sentencing, and ordered appellant to serve 180 days in jail on the charge of aggravated menacing, and 90 days in jail, each, on the charges of resisting and obstructing. The court suspended all of the days of the sentence, and ordered appellant to serve one year of probation, with the conditions that he have no more criminal convictions, and that he be fully compliant with his treatment at the Zepf Center.

## II. Law and Analysis

**{¶ 25}** Appellant has appealed his judgment of conviction, and now asserts three assignments of error for our review:

1. The trial court abused its discretion and erred to the prejudice of appellant by convicting him of aggravated menacing pursuant to R.C. 2903.21A.

2. Appellant's conviction for resisting arrest pursuant to R.C. 2921.33A was not supported by the manifest weight of the evidence.

3. Appellant's conviction for obstructing official business pursuant to R.C. 2921.31A was not supported by the manifest weight of the evidence.

**{¶ 26}** Appellant's assignments of error all pertain to whether his convictions were against the manifest weight of the evidence.[1]  When reviewing the claim that a verdict is against the manifest weight of the evidence, "we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'"  *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction."  *Id.*

**{¶ 27}** For ease of reading, we will discuss appellant's assignments of error in reverse order so as to maintain the chronological order of the offenses as well as the order in which the trial court addressed them.

---

[1] Although appellant uses the terminology "abuse of discretion" in his first assignment of error, it is clear from the substance of his argument that he is challenging the propriety of his conviction on manifest weight.

12.

## A. Obstructing Official Business

{¶ 28} In his third assignment of error, appellant challenges his conviction for obstructing official business in violation of R.C. 2921.31(A), which provides, "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." "To support a conviction for obstructing official business, the state must prove that the accused engaged in an unprivileged affirmative act, that the act was done with a purpose or intent to hamper or impede the performance of a public official's duties, and that the act did, in fact, substantially hamper or impede the public official in the performance of his or her duties." *Toledo v. Dandridge*, 6th Dist. Lucas No. L-10-1333, 2013-Ohio-317, ¶ 16, citing *State v. Mignard*, 6th Dist. Ottawa Nos. OT-10-007, OT-10-008, 2010-Ohio-5177, ¶ 22.

{¶ 29} Appellant argues that a conviction for obstructing official business requires an affirmative act, and that his conduct of "hunkering down" in the car does not constitute an affirmative act. We note that although appellant's assignment of error challenges his conviction based upon manifest weight, he effectively argues that his conviction is not supported by sufficient evidence. While appellant did not specifically assign error challenging the sufficiency of the evidence, "a review of the weight of the evidence necessarily involves an evaluation of the sufficiency of the evidence in that, in order for this Court to weigh the evidence, there must be evidence to weigh." *State v.*

13.

*Frum*, 9th Dist. Wayne No. 12CA0039, 2013-Ohio-1096, ¶ 4. *See also State v. Short*, 2017-Ohio-7200, 144 N.E.3d 1037, ¶ 22 (2d Dist.) ("Where there is insufficient evidence to support a conviction, it will also necessarily be against the manifest weight of the evidence.").[2]

{¶ 30} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 31} The state argues that appellant engaged in several affirmative acts that hampered and impeded the officers' lawful duties. Specifically, the state identifies appellant's non-responsive answers to Tucker's request for appellant's identification and insurance, appellant's act of "hunkering down" in the car, and appellant's act of grabbing onto the door frame, as acts that would support his conviction.

{¶ 32} The circumstances in this case are similar to the circumstances in *Dandridge*, 6th Dist. Lucas No. L-10-1333, 2013-Ohio-317. In that case, the defendant was pulled over for not having a visible license plate on the vehicle. The officer then asked the defendant for his driver's license, to which the defendant responded "I don't

---

[2] Of course, the reverse is not true. "[A]lthough there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

14.

have to give it to you." *Dandridge* at ¶ 2. The defendant eventually revealed that the car was registered to him, and that his name was Keith. When the officer ran the license plate number he learned that the defendant's driver's license was expired. The officer again asked the defendant for his driver's license, and the defendant refused. The officer then opened the car door and informed the defendant that he was under arrest. The defendant refused to exit the car. When the officers attempted to physically remove the defendant, he wrapped his arms around the back of the seat and hooked his knees under the steering wheel. The officers ultimately sprayed mace in the defendant's face and removed him from the car. *Id.*

{¶ 33} The defendant was charged and convicted of obstructing official business, and challenged that conviction on appeal. In reversing the conviction, we recognized that "[i]t is well-settled that 'a defendant's refusal to provide his drivers' license to an officer upon request [does] not constitute obstructing official business.'" *Id.* at ¶ 18, quoting *Middletown v. Hollon*, 156 Ohio App.3d 565, 2004-Ohio-1502, 807 N.E.2d 945, ¶ 32 (12th Dist.). "Similarly, the mere refusal to answer a police officer's questions regarding one's identity cannot support a conviction for obstructing official business." *Id.*, citing *Cleveland Hts. v. Lewis*, 187 Ohio App.3d 786, 2010-Ohio-2208, 933 N.E.2d 1146, ¶ 37 (8th Dist.). The rationale behind these cases is that "one cannot be guilty of obstructing official business by doing nothing." *Hollon* at ¶ 30, quoting *Hamilton v. Hamm*, 33 Ohio App.3d 175, 176, 514 N.E.2d 942 (12th Dist.1986). However, "[a]lthough simply refusing to provide one's information to a police officer may not constitute obstruction of

official business, when one takes overt acts to impede or obstruct the officer's investigation or business, one may be found guilty of obstructing official business." *Id.* at ¶ 33, quoting *State v. Merz*, 12th Dist. Butler No. CA97-05-108, 2000 WL 1051837 (July 31, 2000).

{¶ 34} Of course, this does not mean that motorists are free to refuse to produce a driver's license to an officer during a lawful stop. Indeed, R.C. 4507.35(A) provides that motorists have an affirmative duty to produce a driver's license when requested by law enforcement. And, under R.C. 4507.35(B)(1), a motorist's refusal to produce a license is punishable as an unclassified misdemeanor, except that the offender shall not be sentenced to a jail term, a community residential sanction, a fine of more than one thousand dollars, or more than five hundred hours of community service.

{¶ 35} Here, however, the state did not charge appellant with a violation of R.C. 4507.35(A). Instead, the criminal complaint charged appellant with obstructing official business in violation of R.C. 2921.31(A) for failing to comply with Tucker's request to produce his driver's license and insurance. As a second-degree misdemeanor, the charge of obstruction carries the potential for various penalties that are not available under R.C. 4507.35, including a jail term of up to 90 days under R.C. 2929.24, and community residential sanctions under R.C. 2929.26. Simply put, while a motorist's failure to provide a driver's license to an officer upon request may constitute an unclassified misdemeanor violation of R.C. 4507.35, *Dandridge* recognizes that the same conduct does not constitute obstructing official business under R.C. 2921.31(A).

16.

**{¶ 36}** Moreover, not only did the criminal complaint specifically allege that the obstruction charge was based upon appellant's mere refusal to produce a license, this was the state's theory throughout trial. When asked by the prosecutor whether "the defendant's acts of refusing to produce the license or any documentation * * * impede[d] your lawful duties to conduct an investigation at that traffic stop," both Tucker and Schroeder confirmed that it did. The state's theory of the case, however, does not constitute the offense of obstructing official business. *See State v. Williams*, 6th Dist. Lucas No. L-17-1071, 2017-Ohio-8344, ¶ 9 (allegations in the criminal complaint that the defendant refused to respond to police questioning did not constitute an overt act to support a conviction of obstructing official business).

**{¶ 37}** Alternatively, the trial court relied upon other facts to justify its conviction for obstructing official business; namely, appellant's act of "hunkering down" in the car, his grabbing of the top of the car door, and his refusal to get out of the patrol cruiser in the sally port of the jail. Similar alternative justifications were raised and rejected in *Dandridge*, and we likewise do so here. As we reasoned in *Dandridge*, "The charge was clearly based on appellant's refusal to provide officers with his driver's license or reveal his identity. The evasive actions taken by appellant occurred only after the officers decided to arrest him for obstructing official business. While those actions supported the conviction for resisting arrest, they could not support a conviction for obstructing." *Dandridge*, 6th Dist. Lucas No. L-10-1333, 2013-Ohio-317, at ¶ 20. In the same way,

17.

appellant's conduct in "hunkering down" or grabbing the door only occurred after he was already being arrested for obstructing official business.

{¶ 38} Furthermore, as stated, the criminal complaint clearly identifies that appellant was being charged for failing to provide his driver's license and insurance.[3] Crim.R. 3 states, "The complaint is a written statement of the essential facts constituting the offense charged." "[T]he purpose of a criminal complaint is to inform the accused of the identity and essential facts constituting the offense charged." *State v. Broughton*, 51 Ohio App.3d 10, 11, 553 N.E.2d 1380 (12th Dist.1988); *State v. Hadley*, 6th Dist. Fulton No. F-09-007, 2009-Ohio-4595, ¶ 8 ("The purpose of a criminal complaint is to inform the accused of the crime for which he is charged."). Here, the essential facts constituting the offense of obstructing official business were that appellant failed to provide his driver's license and insurance. The complaint did not describe or allude to appellant's physical conduct subsequent to the initiation of his arrest as essential facts. Therefore, we hold that the trial court could not use appellant's physical response as an alternative basis to support appellant's conviction for obstructing official business.

---

[3] The criminal complaint describes the facts of the offense as:

> While working unit 837 with Officer Tucker 2577 conducted a traffic stop. Defendant Mr. Kelly did delay and obstruct the performance of this officer and Officer Tucker 2577 during the traffic stop. Defendant after several requests to produce his drivers license and insurance did not. Defendant refused to produce stating he was in a parking lot and we could not do anything. Due to defendant not complying to produce his license impeded officers duty. This officer and Officer Tucker are the source of this information. This occurred in Toledo, Lucas County, OH.

{¶ 39} To be clear, we recognize that the criminal rules do not require "fact pleading," and a criminal complaint may be amended, even during the trial, pursuant to Crim.R. 7(D). Here, however, appellant was notified in the complaint that the essential facts supporting the obstruction charge were that he refused to provide his driver's license and insurance. Although the prosecution was not limited to the facts recited in the complaint—and was free to pursue additional theories at trial—the trial proceeded upon the theory as alleged in the complaint, and the complaint was never amended. Thus, appellant did not have notice either before or during trial that additional facts— particularly his conduct that occurred *after* he was already arrested for obstruction— could be essential to support his conviction for obstruction.

{¶ 40} Accordingly, appellant's conviction for obstructing official business is not supported by sufficient evidence, and his third assignment of error is well-taken.

### B. Resisting Arrest

{¶ 41} In his second assignment of error, appellant challenges his conviction for resisting arrest. Under R.C. 2921.33(A), "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another."

{¶ 42} The only issue presented by appellant is whether he forcefully resisted his arrest. He argues that there is no evidence that he recklessly or by force resisted arrest. As we previously explained, a review of the weight of the evidence necessarily requires us to evaluate the sufficiency of the evidence. *State v. Cabrera*, 9th Dist. Lorain No. 13CA010434, 2014-Ohio-3372, ¶ 6. Given our conclusion that appellant's conviction for

obstructing official business was not supported by sufficient evidence—and this is one of the officers' justifications for arresting appellant—we first address whether or not appellant was subject to a "lawful arrest" for purposes of R.C. 2921.33(A).

{¶ 43} Under Ohio law, a conviction for resisting arrest does not require that the defendant be convicted of the offense for which he was arrested, so long as the arresting officer had "probable cause or a reasonable basis to believe that the offense for which the defendant was arrested did, in fact, occur." *State v. Rose*, 75 Ohio App.3d 656, 658, 600 N.E.2d 382 (2d Dist.1991). It is well-established that a conviction for obstructing official business requires an affirmative act, and the failure to produce one's identification is not an affirmative act sufficient to form the basis for an obstructing-official-business conviction. Thus, where a resisting-arrest conviction is premised on an arrest for obstruction that is based on the defendant's refusal to produce identification, the officer lacks a reasonable basis for the arrest. *See Garfield Hts. v. Simpson*, 82 Ohio App.3d 286, 292, 611 N.E.2d 892 (8th Dist.1992) (finding that in the absence of an affirmative act, the officer lacked a reasonable basis for concluding that defendant obstructed official business and defendant should have been acquitted of resisting arrest). Because the officers testified that they arrested appellant for obstructing official business based on his failure to produce his driver's license, we find that they lacked a reasonable basis for believing appellant committed that offense.

{¶ 44} But, Officer Tucker told appellant she was arresting him because he was driving "with no license" and had expired plates, and the criminal complaint here

20.

provides *two* reasons that officers decided to arrest appellant: the obstruction charge *and* the charge for driving under a suspended license.

{¶ 45} First, we note that appellant's failure to produce a driver's license was not an arrestable offense in this case. As noted above, a violation of R.C. 4507.35(B)(1) is an unclassified misdemeanor. Likewise, driving with expired license plates is also a minor misdemeanor. *See* R.C. 4503.11(D). R.C. 2935.26(A) prohibits arrests for minor misdemeanors unless certain exceptions apply—including "[t]he offender cannot or will not offer satisfactory evidence of his identity." Although a driver's license is "satisfactory evidence" of identity, R.C. 2935.26(A) does not "create a requirement that citizens carry and produce 'papers' to prove who they are," nor does it require drivers to "produce 'papers' to prove they are validly licensed." *State v. DiGiorgio,* 117 Ohio App.3d 67, 70, 689 N.E.2d 1018 (2d Dist.1996). Instead, "satisfactory evidence" for purposes of R.C. 2935.26(A) has been held to include information that is sufficient to enable officers to verify the person's identity—such as a name, address, and social security number. *Id.*

{¶ 46} Here, Officer Tucker never asked appellant for identification after she determined he could not or would not produce a driver's license. Instead she immediately took appellant from his vehicle and arrested him. Because Officer Tucker's arrest preceded any attempt to elicit satisfactory evidence of identification from appellant, the "evidence of identity" exception remained unsatisfied and Officer Tucker could only issue a citation for appellant's minor misdemeanors.

21.

**{¶ 47}** Second, we find that the evidence makes clear that the officers lacked a reasonable basis to believe that appellant could be arrested for driving under suspension. This is because both Tucker and Schroeder testified that at the point they ordered appellant to step out of the vehicle (after which they immediately arrested him), appellant had not yet been identified. Both clearly testified that they "did not have any idea of who he was at that point." ("[W]e just didn't know who we were talking to at that point once he [refused to produce his identification].") If neither officer knew who appellant was at the point they arrested him, they necessarily could not have known that his license was suspended and could not have reasonably believed that appellant had committed the crime of driving under suspension. Accordingly, because the officers lacked a reasonable belief that appellant committed either of the two crimes for which they had arrested him, appellant was not lawfully arrested and appellant's resisting conviction is not supported by sufficient evidence.[4]

**{¶ 48}** Appellant's second assignment of error is well-taken.

---

[4] In *City of Mentor-On-The-Lake v. Roberts*, 11th Dist. Lake No. 88-L-13-168, 1989 WL 157244, *2 (Dec. 29, 1989), in the context of a motion to suppress evidence seized in connection with a warrantless arrest, the court observed that an "arrest is still valid, even though the offense later used to support it is different than the one used when the arrest occurred." The court found that "[t]he only requirement[] is that the conduct which formed the basis of the arrest must support an objective finding of probable cause to arrest under the subsequent charge and that a nexus must exist between the original charge and the subsequent charge." *Id.* Here, the state did not assert that any other offense besides obstructing official business or driving under suspension supported appellant's arrest.

22.

## C. Aggravated Menacing

{¶ 49} Finally, in his first assignment of error, appellant challenges his conviction for aggravated menacing. R.C. 2903.21(A) provides, "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." Importantly, "[t]he state does not have to prove the offender's ability to carry out a threat, nor does the state have to show any movement by the offender toward carrying out the threat." *State v. Yoder*, 6th Dist. Erie No. E-19-031, 2020-Ohio-4546, ¶ 12; *State v. Schwartz*, 77 Ohio App.3d 484, 486, 602 N.E.2d 671 (12th Dist.1991) ("Neither aggravated menacing nor menacing requires that the offender be able to carry out his threat or even believe himself capable of carrying it out. It is sufficient if the offender knowingly causes the victim to believe the offender will carry his threat into execution.").

{¶ 50} In support of his assignment of error, appellant argues that his statements were those of a mentally ill person, made after he had been unjustly arrested for traffic infractions that were ultimately dismissed. Appellant describes that he did not have any weapons or contraband, that the majority of his statements were generalized statements about "white people," and that the statements were made while he was in custody in handcuffs. Appellant concludes that his statements did not constitute a reasonable threat that should cause Tucker to believe that she would be subject to serious physical harm.

23.

{¶ 51} The state, on the other hand, argues that appellant's specific threat that he had an AK-47 with Tucker's name on it, and that she should get a temporary protection order against him, made Tucker's subjective belief of harm reasonable. We agree with the state. The evidence demonstrates that appellant made specific violent threats against Tucker, which, according to her, caused her to be in fear of serious physical harm. We find her testimony regarding her fear to be reasonable and credible in light of all the circumstances of this case. Therefore, we hold that appellant's conviction for aggravated menacing is not against the manifest weight of the evidence.

{¶ 52} Accordingly, appellant's first assignment of error is not well-taken.

### III. Conclusion

{¶ 53} Because merely refusing to provide identification upon an officer's request is not a sufficient basis to support a conviction for obstructing official business, we find appellant's third assignment of error well-taken. And because the officers lacked a reasonable belief that appellant committed either of the two crimes for which they had arrested him (obstructing official business and driving under suspension), appellant was not lawfully arrested and his resisting-arrest conviction is not supported by sufficient evidence. We, therefore, find his second assignment of error well-taken. We find, however, that appellant's challenge to his conviction for aggravated menacing is not against the manifest weight of the evidence because appellant made a specific threat to the officer, causing her to believe that she would be subject to serious physical harm. We find his challenge to his first assignment of error not well-taken       .

24.

**{¶ 54}** Therefore, we affirm the April 1, 2021 judgment of the Toledo Municipal Court, in part, and reverse, in part. Appellant's conviction for aggravated menacing is affirmed. Appellant's convictions for obstructing official business and resisting arrest are reversed and vacated, and those charges are ordered dismissed. The parties are to share the costs of this appeal evenly pursuant to App.R. 24.

Judgment affirmed, in part,<br>and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

_____

Gene A. Zmuda, J.
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.